UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WARNER MASSEY, *et al.* )<br>    Plaintiffs, )<br>)<br>v. )<br>)<br>DISTRICT OF COLUMBIA, *et al.* )<br>    Defendants. )<br>) | Case No. 1:05-cv-2033 (RCL) |

**PLAINTIFFS' REPLY MEMORANDUM TO DEFENDANTS' ADDENDUM TO OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**I.  INTRODUCTION**

At the October 27, 2005 preliminary injunction hearing in this matter, the Court requested Defendants to submit affidavits (1) to explain why District of Columbia Public Schools ("DCPS") had failed to comply with certain statutory deadlines in Plaintiffs' administrative due process matter and (2) to support Defendants' contention that MM Washington Center is an appropriate school placement for T.M., Plaintiffs' daughter. On October 28, 2005, Defendants submitted affidavits with an Addendum to Defendants' Opposition to Plaintiffs' Motion For Preliminary Injunction ("Addendum"), to which Plaintiffs now reply.

**II.  ARGUMENT**

    **A.  Defendants have not met their obligation to provide a written response to Plaintiffs' due process complaint.**

In their Addendum, Defendants argue that they have met their obligation under 20 U.S.C.A. § 1415(c)(2)(B)(i) to provide a written response to Plaintiffs' due process complaint by virtue of having faxed to Plaintiffs' advocates the October 17, 2005, multidisciplinary team

1

(MDT) prior notice ("October 17 notice").[1]  Attachment A, October 17 notice.

The October 17 notice does not meet the requirements of § 1415(c)(2)(B)(i).  In their Addendum, Defendants present a severely truncated version of that section, thereby neglecting to note that the section specifies exactly what such a response must include.  These requirements are nearly identical to the requirements for prior written notice issued under § 1415(b)(2)(B)(3)(A) for changing a student's educational placement.[2]  As explained by Plaintiffs'

---

[1] The October 17 notice is also the same document which Defendants argue satisfies their obligation under § 1415(b)(2)(B)(3)(A) to provide written notice of the change of educational placement to MM Washington Center.  Standard legal procedure dictates that a form used for another purpose (even if done properly) does not substitute for a written response to a pleading.

[2] Under § 1415(c)(2)(B)(i), the components of a written response to a due process complaint are:
    (aa) an explanation of why the agency proposed or refused to take the action raised in the complaint;
    (bb) a description of other options that the IEP Team considered and the reasons why those options were rejected;
    (cc) a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action; and
    (dd) a description of the factors that are relevant to the agency's proposal or refusal.

Section 1415(c)(1) sets forth the components of § 1415(b)(2)(B)(3)(A) prior written notice of a change in placement:
    (A) a description of the action proposed or refused by the agency;
    (B) an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;
    (C) a statement that the parents of a child with a disability have protection under the procedural safeguards of this part...;
    (D) sources for parents to contact to obtain assistance in understanding the provisions of this part;
    (E) a description of other options considered by the IEP Team and the reasons why those options were rejected; and
    (F) a description of the factors that are relevant to the agency's proposal or refusal.

counsel at both the October 27, 2005 preliminary injunction hearing and the October 18, 2005 temporary restraining order hearing, the October 17 notice is severely deficient as prior written notice for a change of placement. For the same reasons, then, the October 17 notice is also deficient as a written response to a due process complaint. Even after these deficiencies had been explained to Defendants at both hearings, Defendants still insist that the October 17 notice is statutorily sufficient. For the reasons explained below, it is not.

        1.        **The October 17 notice fails to meet statutory requirements and makes material misrepresentations.**

                a.        **The October 17 notice fails to meet statutory requirements.**

The October 17 notice fails to meet the requirements of 20 U.S.C.A. § 1415(c)(2)(B)(i). First, the October 17 notice in no way provides an "explanation of why the agency proposed or refused to take the action raised in the complaint." 20 U.S.C.A. § 1415(c)(2)(B)(i)(I)(aa). In their Addendum, Defendants characterize the "subject matter" of the due process complaint generally as "the alleged failure of DCPS to place the student." Addendum 2. To the contrary, the first "action raised in the complaint" is Plaintiffs' request to place T.M. at Leary School (and DCPS's failure to respond to Plaintiffs' two prior written requests to do the same). The October 17 notice makes no mention whatsoever of Leary School. The October 17 notice also makes no mention of the other issue raised in the complaint, that of compensatory education.

Second, the October 17 notice fails to describe "other options that the IEP Team considered and the reasons why those options were rejected." 20 U.S.C.A. § 1415(c)(2)(B)(i)(I)(bb). Again, the October 17 notice fails to mention any other options considered, either Leary School or the other school which DCPS claims to have been, on its own,

3

considering, DCALA Senior Center.[3]

Third, the October 17 notice describes no evaluations or assessments "used as the basis for the proposed or refused action." 20 U.S.C.A. § 1415(c)(2)(B)(i)(I)(cc). Although the October 17 notice appears on a preprinted form that includes a two-page list, with accompanying boxes to check, entitled "evaluation procedures, test, records or reports used," none of the boxes are checked.

Fourth, the October 17 notice fails to describe "the factors that are relevant to the agency's proposal or refusal." 20 U.S.C.A. § 1415(c)(2)(B)(i)(I)(dd). Again, that space on the October 17 notice is blank.

### b.  The October 17 notice makes material misrepresentations.

The October 17 notice makes material misrepresentations which cast considerable doubt upon its veracity and create irreconcilable inconsistencies in Defendants' positions.

First, the October 17 notice lists T.M.'s "Current Disability Category" as "Emoinally Disturbed" [sic]. T.M.'s current IEP lists her as both Emotionally Disturbed *and* Learning Disabled. The October 17 notice fails to accurately consider this most fundamental component of the IEP.

Second, the October 17 notice incorrectly states that T.M.'s mother was "an invited

---

[3] DCALA Senior Center is clearly inappropriate for T.M. because it is a school for 11th and 12th graders; T.M. is in the 10th grade. In their Addendum and their Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Opposition"), Defendants assert that DCALA has other sites which are age appropriate. Addendum 3; Opposition 7, n.2. However, Defendants have not even named these sites. Furthermore, Defendants' Opposition is clear that during the October 12, 2005 phone call when Defendants' counsel first proposed alternative placements, she specified that the school which DCPS was considering was DCALA Senior Center. Opposition 4.

member" of the multidisciplinary team (MDT) which made three important decisions about T.M.'s special education, including her placement.[4] The October 17 notice also lists the following as the "MDT Members":  Principal or Designee, Parent, Student, Special Education Teacher, LEA & Interpreter, and Ed. Advocate.  T.M.'s parents were never invited members of any team that made any of these decisions, nor were their special education advocates.[5]  Despite the October 17 notice's claim of multidisciplinary team involvement, the affidavit of Lori Ludwick, submitted with Defendants' Addendum, makes clear that the October 17 notice was without question issued *unilaterally* by DCPS based only on Ms. Ludwick's determination.  Upon visiting MM Washington Center on October 28, 2005, Plaintiffs learned that, indeed, staff at the school did not know who T.M. was and did not know that DCPS had issued its purported notice of placement there.  Attachment B, Massey Affidavit ¶¶ 2, 6-7 ("Massey Affidavit").  Tellingly, Ms. Ludwick's affidavit also makes no mention of the October 17 notice addressed the due process request, or that she even knew the due process matter was pending.  There is simply no evidence that the October 17 notice was issued in response to Plaintiffs' due process request.

    For the foregoing reasons, the October 17 notice does not satisfy Defendants' obligation

---

[4] These decisions are:  (1) "Your child is eligible or continues to be eligible to receive special education services as a student with Emotoal Disturbances [sic]."  (2) "Your child will begin receiving Specialized Instruction and Counseling as a related service(s)."  (3) "Your child's alternative placement on continuum (next setting) is being changed, from RiversideAcademy [sic] to MM Washngton Center [sic]."

[5] The only team of which T.M.'s parents were invited members, and in which they participated, was the September 21, 2005 IEP team.  That team made none of the conclusions asserted in the October 17 notice.  Rather, that team concluded the following:  (1) T.M. is Emotionally Disturbed *and* Learning Disabled; (2) T.M. will receive Special Education Instruction, Counseling, *and* Psychological Services in the form of Art Therapy; and (3) DCPS would propose an educational placement by September 26, 2005, which it failed to do.  MM Washington was not even identified as a possible placement option at the meeting.

to provide a written response to Plaintiffs' due process complaint. (Nor does it satisfy Defendants' obligation to respond to Plaintiffs' written requests for placement at Leary School.)

### B. Defendants have not met their statutory obligation to timely convene a resolution meeting.

Under 20 U.S.C.A. § 1415(f)(1)(B), Defendants are required to convene a resolution meeting regarding Plaintiffs' due process complaint within fifteen (15) days of the complaint's filing (October 11, 2005). On October 27, 2005, in the afternoon after the 10:00 a.m. preliminary injunction hearing before this Court, Plaintiffs' counsel received, by facsimile, a notice of a resolution meeting ("resolution notice") to be held November 4, 2005 – twenty-four (24) days after the filing of the complaint and nine (9) days after the statutory deadline. The resolution notice was sent by Ms. Gina Scales-Johnson. In an affidavit submitted with Defendants' Addendum, Ms. Scales-Johnson, a DCPS Resolution Session Scheduling Coordinator, confirms the same. Scales-Johnson Declaration ¶ 4.

Ms. Scales-Johnson also states that she made other efforts to schedule Plaintiffs' resolution meeting. Ms. Scales-Johnson states that she made four (4) phone calls to Plaintiffs' home: first on October 18, 2005, at 2:01 p.m.; again on October 18, 2005, at 3:40 p.m.[6]; October 19, 2005, at 2:00 p.m.; and finally on October 25, 2005, at 3:47 p.m. Scales-Johnson Declaration ¶ 3. She states she left a message each time. *Id.* Plaintiffs have received only one phone message from Ms. Scales-Johnson. Massey Affidavit ¶ 11. (As they do not check their voicemail regularly, Plaintiffs did not hear this message until October 28, 2005, when their

---

[6] Ms. Scales-Johnson does not explain why, after supposedly leaving a message at 2:01 p.m., she called back and left another message on the same day only one hour and thirty-nine minutes later.

special education advocate, Mr. Kull, called them and asked if they had received any such messages. *Id*.)  In the message, Ms. Scales-Johnson stated that it was her third time "trying to call" regarding the resolution meeting; she did not state that it was her third message.  *Id*.  She further stated that she would select a date for the resolution meeting if she did not hear back from Plaintiffs, and then call again to announce the date.  *Id.*  Plaintiffs received no such follow-up message from Ms. Scales-Johnson.  *Id.*

Ms. Scales-Johnson also states in her affidavit that she sent the resolution notice to Plaintiffs by certified and regular mail on October 25, 2005, the day before the meeting deadline expired and two days *before* the preliminary injunction hearing before this Court.  Scales-Johnson Declaration ¶ 4; Addendum 3.  Exhibit 3 to Defendants' Addendum is a copy of the resolution notice, along with the certified mail receipt.  Plaintiffs did not receive the resolution notice by mail until October 29, 2005.  Massey Affidavit ¶ 10.  The envelope received by Plaintiffs is postmarked October 28, 2005.  *Id.*; Attachment C, Copy of envelope.  Attachment D, Printout of United States Post Office "Track and Confirm" webpage (showing both delivery and "arrival at unit" on October 29, 2005).  Thus, although DCPS alleges to have sent the resolution notice by mail *prior* to the preliminary injunction hearing, the postmarked envelope and USPS website indicate otherwise.

For the foregoing reasons, Defendants have not met their statutory obligation to timely convene a resolution meeting regarding Plaintiffs' due process complaint.

**C.     MM Washington Center is not an appropriate educational placement for T.M.[7]**

The Individuals with Disabilities Education Improvement Act (IDEIA) is clear that DCPS "shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child." 20 U.S.C.A. § 1414(e). The importance of this requirement is exemplified by the instant case, in which DCPS's outright exclusion of T.M.'s parents from the decision-making process has led to the proposal of a school which is inappropriate for T.M.

On October 28, 2005, T.M., along with her parents, Ms. Maleka Walters, her Multisystemic (MST) Family Counselor, and Mr. Kull, visited MM Washington Center to assess first-hand the school's appropriateness for T.M. The group was given a tour of the school by Mr. Peter Noble, one of the school's social workers. The group also met briefly with Mr. Martin

---

[7] Though Plaintiffs explain herein why MM Washington Center is not an appropriate educational placement for T.M., Plaintiffs reiterate that Defendants' failure to comply with IDEIA procedural safeguards – in (1) failing to provide T.M. with a free appropriate public education (FAPE) by not properly placing her and (2) failing to involve T.M.'s parents in the placement process – constitutes irreparable harm necessitating injunctive relief. The law is well established that courts may order injunctive relief based on no more than failure to comply with IDEIA procedural safeguards. *See generally School Comm. of the Town of Burlington, Mass. v. Dept. of Educ. of Mass.*, 471 U.S. 359, 369 (1985) (interpreting 20 U.S.C.A. § 1415(e)(2) [now codified at § 1415(i)(2)(C)] to give courts broad discretion to grant relief that is "'appropriate' in light of the purpose of the Act"); *Blackman v. District of Columbia*, 277 F Supp. 2d 71 (D.D.C. 2003) (granting injunctive relief for DCPS's failure to timely convene due process hearings). The Supreme Court in *Burlington* created a remarkable remedy in granting parents the right to receive reimbursement for placing their children when school personnel deny FAPE – a right later codified by Congress at 20 U.S.C.A. § 1412(a)(10)(C). Defendants cannot deny that Plaintiffs would have placed T.M. at Leary School if they had the means, and then been reimbursed by DCPS. Indeed, Defendants have acknowledged that they owe T.M. compensatory education from August 29 to October 17, 2005. Opposition 11. Plaintiffs do not believe that Congress – in emphasizing the importance of parents' rights and granting broad authority to the courts – intended to protect only wealthy parents.

Cherry, the school's special education coordinator. Massey Affidavit ¶ 2; Attachment E, Affidavit of Maleka Walters, ¶ 14 ("Walters Affidavit"). As explained below, MM Washington is not an appropriate educational placement for T.M.

>    1.   **MM Washington Center is inappropriate for T.M. because it cannot provide the student-teacher ratio required by T.M.'s Individualized Education Program (IEP).**

T.M.'s most current IEP specifies that she requires a student-teacher ratio of no more than ten-to-two. Attachment F, Current IEP, 2. Defendants assert that the ratio at MM Washington Center is "no more than 10:2." Ludwick Declaration ¶ 5. Beyond asserting that she has "extensive knowledge of the Division 6 programs," *Id.* ¶ 3, Ms. Ludwick does not set forth the basis for her assertion that the ratio is "no more than 10:2." On the other hand, Mr. Noble, who works at MM Washington Center and would therefore have more accurate, current knowledge of the program, stated that the ratio is twelve-to-two in most classes, and twelve-to-one in others. Massey Affidavit ¶ 4; Walters Affidavit ¶ 14. On this statistic alone, MM Washington Center is inappropriate for T.M. based on her current IEP.

>    2.   **MM Washington Center is inappropriate for T.M. because it cannot meet her Learning Disability needs.**

T.M.'s current IEP identifies her as Emotionally Disturbed and Learning Disabled. Attachment F, Current IEP, 1. Her most recent achievement tests indicated performance at "grade equivalent" levels as low as 2.3 (meaning three months into the second grade). Attachment G, July 2005 test results.[8] Mr. Noble stated that MM Washington Center has as its main focus students' behavioral problems; the school's goal "is for the students to leave" once

---

[8] These test results were produced by the special education coordinator for Riverside Academy at the September 21, 2005 IEP meeting.

their behavioral problems are addressed so that they can return to their neighborhood school. Massey Affidavit ¶ 3; Walters Affidavit ¶ 14. Ms. Ludwick characterizes MM Washington Center in a different way, as a school for "students whose primary disability is Emotional Disturbance (ED) and those with a secondary disability of LD (Learning Disabled)." Ludwick Declaration ¶ 5.

There is nothing in T.M.'s IEP to suggest that Emotionally Disturbed is her *primary* disability and that Learning Disabled is her *secondary* disability. Indeed, T.M.'s low achievement test scores demonstrate that her Learning Disability is significant, as she is sixteen yet performing in some areas at the second-grade level. Thus her education should adequately address *both* of her disabilities, and not prioritize one at the expense of another. *See* 20 U.S.C.A. § 1401(9)(D) (free appropriate public education must be "provided in conformity with the [IEP]"). As explained by Mr. Noble, MM Washington Center is a school for children who, once their behavioral problems are adequately addressed, could return to neighborhood schools.

DCPS's failure to adequately consider T.M.'s Learning Disability is an ongoing problem. Indeed, it forms the foundation of Plaintiffs' compensatory education claim in their due process complaint. When T.M. was first identified as a special education student, she was identified *only* as Learning Disabled. Attachment H, Covers of past IEPs. In 2001, she continued to be identified as only Learning Disabled. *Id.* In 2002, she was identified as Multiple Disabled (Learning Disabled *and* Emotionally Disturbed). *Id.* However, in 2003 and twice in 2004, the classification of Learning Disabled was inexplicably dropped from her IEPs.[9] *Id.* Not

---

[9] T.M.'s special education advocate pointed out this omission at the September 21, 2005 IEP meeting. The IEP Team then unanimously agreed to change the IEP to include an "LD" classification.

surprisingly, then, from 2002 until the present (when she was *not* properly identified as Learning Disabled), her achievement test scores in fact *declined*, from fifth- and fourth-grade levels in 2002 (Attachment I, Test results from May 2002 IEP) to fourth-, third- and second-grade levels (Attachment G, July 2005 test results).

Now, DCPS proposes to place T.M. in a school where once again her Learning Disability will not be a primary focus of her education. For this reason, MM Washington Center is an inappropriate educational placement for T.M.

### 3. MM Washington Center is inappropriate for T.M. because of the school's location and her self-destructive history of running away from home.

One of the focal points of T.M.'s ongoing therapy is her history of running away from home. Walters Affidavit ¶¶ 5-8. In the year prior to her August 2004 admittance to Riverside Hospital (when she was 14), T.M. ran away from home approximately twenty (20) times. *Id.* at ¶ 7; *See* Massey Affidavit ¶ 8. When she would run away from home, she would engage in unsafe, high-risk behavior – including drug and alcohol use, and solicitation – and associate with negative peers, including substance abusers. Massey Affidavit ¶ 8; Walters Affidavit ¶¶ 7, 10. This behavior would often take place in the same neighborhood as MM Washington Center, only blocks away from the school. Massey Affidavit ¶ 8; Walters Affidavit ¶¶ 7, 10. Because T.M. has also run away from home since her discharge from Riverside, the risk posed by this behavior continues today. Walters Affidavit ¶ 9.

Were T.M. to attend school at MM Washington Center, the risk to her well-being would be great. The potentially disabling effect of attending school in a neighborhood that is "closely linked to the self-destructive behavior of T.M.'s running away" makes MM Washington Center

11

an inappropriate placement for her. Walters Affidavit ¶ 15. Everyday, students from MM Washington Center are dismissed at the same time with all of the regular education students in the upstairs high school. Massey Affidavit ¶ 5. Because she is easily influenced by others, and because she would be located within the neighborhood where she has engaged in such self-destructive behavior, T.M.'s parents, her Family Counselor, and her Clinical Case Manager logically have grave concerns about her attending MM Washington Center.[10] Massey Affidavit ¶ 9; Walters Affidavit ¶ 15; Attachment J, Affidavit of Diana Mendelsohn, ¶ 15 ("Mendelsohn Affidavit")

For this reason, MM Washington Center is an inappropriate educational placement for T.M.

### 4. MM Washington Center is inappropriate for T.M. because of her history of serious mental illness and need for a structured setting.

Were T.M. to attend MM Washington Center, the risk of harm to her is further exacerbated due to the combination of her serious mental illness and the school's lack of structure. Upon visiting MM Washington Center, Ms. Diana Mendelsohn, T.M.'s Clinical Case Manager, observed a chaotic environment in which students were running through the halls, cursing and disrespecting authority figures. Mendelsohn Affidavit ¶ 13. Based on her experience working with T.M. and other special education students, Ms. Mendelsohn believes this environment, combined with "T.M.'s history of serious mental illness, trauma, unstable recovery and functioning," would contribute to a "risk of decompensating and returning to the hospital." *Id.* ¶ 14.

---

[10] On the other hand, Leary School is located in a much more secluded location, where T.M. would not be exposed to the destructive influences of her past. Walters Affidavit ¶ 13.

For this reason, MM Washington Center is an inappropriate educational placement for T.M.

### III.    CONCLUSION

If DCPS had engaged T.M.'s parents in any meaningful way in the placement process, the foregoing concerns could have been addressed.  Indeed, DCPS was obligated to do just that.  *See* 20 U.S.C.A. § 1414(e) (parents must be involved in the placement process); *Bd. of Educ. of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 205-06 (1982) ("[W]e think the importance Congress attached to [the IDEIA's] procedural safeguards cannot be gainsaid.  It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process [citation omitted] as it did upon the measurement of the resulting IEP against a substantive standard");  *McKenzie v. Smith*, 771 F.2d 1527, 1532 (D.C. Cir. 1985) ("The underlying assumption of the Act is that to the extent its procedural mechanisms are faithfully employed, handicapped children will be afforded an appropriate education"); *Holland v. District of Columbia*, 71 F.3d 417, 421 (D.C. Cir. 1995) ("The IDEA anticipates significant parental involvement in the education of a child with a disability.  The Act establishes detailed procedural safeguards to protect 'children with disabilities *and their parents*.' 20 U.S.C. § 1415(a)") (emphasis in original).  *Cf. School Comm. of the Town of Burlington, Mass. v. Dept. of Educ. of Mass.*, 471 U.S. 359, 369 (1985) (interpreting 20 U.S.C.A. § 1415(e)(2) [now codified at § 1415(i)(2)(C)] to give courts broad discretion to grant relief that is "'appropriate' in light of the purpose of the Act").

Instead, because DCPS has repeatedly violated the IDEIA's procedural safeguards and

excluded T.M.'s parents from the placement process, DCPS has proposed a school that is in at least three serious ways inappropriate for T.M.  Furthermore, DCPS continues to violate IDEIA procedural safeguards by failing to comply with the requirements of the administrative hearing process.  In fact, it is only when observed by this Court that Defendants have made any serious efforts at compliance.  Even then, they have fallen short.

        Respectfully submitted,

          /s/ Joseph B. Tulman
        Joseph B. Tulman, Esq.
        Bar No. 297671

          /s/ Benjamin Kull
        Benjamin Kull
        Law Student Advocate

        University of the District of Columbia
        David A. Clarke School of Law
        Juvenile and Special Education Law Clinic
        4200 Connecticut Avenue, Bldg. 39, 2nd Floor
        Washington, D.C.  20008
        (202) 274-7314
        fax: (202) 274-5569
        *Counsel for Plaintiffs*

        October 31, 2005